## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **DONNA MICHELLE BELTON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:16-cv-02015-MHH** |
| | } | |
| **NANCY A. BERRYHILL,** | } | |
| **Acting Commissioner of** | } | |
| **Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Donna Michelle Belton seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Belton's claims for a period of disability and disability insurance benefits and supplemental security income. For the reasons stated below, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Ms. Belton applied for a period of disability and disability insurance benefits and supplemental security income on May 26, 2015 and January 15, 2016, respectively. (Doc. 6-3, p. 27; Doc. 6-4, p. 2). Ms. Belton alleges that her disability began February 18, 2015. (Doc. 6-6, p. 2). The Commissioner initially

denied Ms. Belton's claims for a period of disability and disability insurance benefits on August 27, 2015. (Doc. 6-5, p. 3). Ms. Belton requested a hearing before an Administrative Law Judge (ALJ). (*Id.*, p. 12).[1] The ALJ issued an unfavorable decision on Ms. Belton's applications on August 9, 2016. (Doc. 6-3, p. 24). On October 21, 2016, the Appeals Council declined Ms. Belton's request for review (Doc. 6-3, pp. 2-6), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. §§ 405(g) & 1383(c).

## II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d

---

[1] Ms. Belton's application for supplemental security income, which she filed after the Commissioner denied her application for a period of disability and disability benefits, was escalated to the hearing level. (Doc. 6-3, p. 27).

1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of

Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Belton has not engaged in substantial gainful activity since February 18, 2015. (Doc. 6-3, p. 29). The ALJ determined that Ms. Belton suffers from the following severe impairments: hypertension, hypothyroidism, obesity, degenerative disc disease with small extrusion at L5-S1, adjustment disorder with mixed anxiety and depressed mood, and IQ scores in the intellectually disabled range. (*Id.*). The ALJ also determined that Ms. Belton has non-severe impairments of palpitations and arrhythmia. (*Id.*, p. 31). Based on a review of the medical evidence, the ALJ concluded that Ms. Belton does not have an impairment or a combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

In light of Ms. Belton's impairments, the ALJ evaluated Ms. Belton's residual functional capacity. The ALJ determined that Ms. Belton has the RFC to:

perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except there would be an environmental limitation due to symptoms of dizziness and vertigo in that any such job should not be performed from elevated platforms or workstations, nor in close proximity to moving machine parts which would be hazardous to an

4

employee if she became dizzy and fell into the same. Any such job should be simple and routine in nature. Contact with the public should be casual. Changes in the work setting should be infrequent and introduced gradually and well explained. The job should not require a specific production quota.

(Doc. 6-3, p. 35).

Based on this RFC, the ALJ concluded that Ms. Belton is not able to perform her past relevant work as a janitor, laborer, certified nursing assistant ("CNA"), salad maker, or steam table attendant. (*Id.*, pp. 38-39). Relying on the testimony from a vocational expert ("VE"), the ALJ found that jobs exist in significant numbers in the national economy that Ms. Belton can perform, including spotter and sorter. (*Id.*, pp. 39-40). Accordingly, the ALJ determined that Ms. Belton has not been under a disability within the meaning of the Social Security Act. (*Id.*, p. 40).

## IV. ANALYSIS

Ms. Belton argues that she is entitled to relief from the ALJ's decision because (1) the ALJ erred by giving little weight to the opinion of Dr. John Goff, Ms. Belton's consultative examining source, and significant weight to the opinions of Dr. Jerry Hart, the DDS's consultative examining source; (2) the ALJ erred by finding that Ms. Belton is not disabled under Listing 12.05(C) for intellectual disability; (3) the ALJ erred by finding Ms. Belton's combination of impairments

is not disabling; and (4) the Appeals Council erred by denying review of the ALJ's decision. (Doc. 11, p. 3). The Court considers these arguments in turn.

### A. The ALJ properly evaluated the medical opinion evidence.

Ms. Belton contends that the ALJ erred by giving the opinions of Dr. Jerry Hart, a consultative examining source, significant weight while giving little weight to the opinions of Dr. John Goff, another consultative examining source. (Doc. 11, p. 13). The Court disagrees.

An ALJ must consider every medical opinion in the administrative record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). Additionally, "'the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor.'" *Gaskin v. Comm'r Soc. Sec.*, 533 Fed. Appx. 929, 931 (11th Cir. 2013) (quoting *Winschel*, 631 F.3d at 1179). Otherwise, the Court "cannot determine whether substantial evidence supports the ALJ's decision." *Denomme v. Comm'r, Soc. Sec.*, 518 Fed. Appx. 875, 877 (11th Cir. 2013) (citing *Winschel*, 631 F.3d at 1179).

The ALJ need not defer to the opinions of a one-time examining source. *Crawford*, 363 F.3d at 1160 (holding that, in general, the opinion of a one-time examining physician is "not entitled to great weight") (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)); *Eyre v. Comm'r, Soc. Sec. Admin.*, 586 Fed.

Appx. 521, 523 (11th Cir. 2014) ("The ALJ owes no deference to the opinion of a physician who conducted a single examination . . . ."). Additionally, "[t]he ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

### 1. *Dr. Hart's Opinion*

For purposes of Ms. Belton's disability evaluation, Dr. Hart, a clinical psychologist, examined Ms. Belton on August 7, 2015. (Doc. 6-9, p. 71). Dr. Hart reviewed some of Ms. Belton's medical records, made behavioral observations, and conducted a mental status exam. (*Id.*, pp. 71-74).

Dr. Hart observed that Ms. Belton was "alert, attentive, and fully oriented" during the examination. (Doc. 6-9, p. 71). However, Dr. Hart noted that Ms. Belton presented her work history and medical information in a "confused fashion." (*Id.*). As the ALJ noted, Ms. Belton reported to Dr. Hart that she could not work because of back problems, knee problems, heart problems, and episodes in which she would "blank out" for a minute. (Doc. 6-3, p. 30; *compare* Doc. 6-9, p. 71). Ms. Belton also reported that she attended special education classes in school and received a certificate rather than a diploma from high school. (Doc. 6-9, p. 72). After high school, Ms. Belton earned a "CNA diploma," but she did not get her CNA certification "due to lack of money and transportation." (*Id.*).

Finally, Ms. Belton told Dr. Hart that she raised two daughters by herself, knows how to do her housework, and spends part of her days reading and watching television. (*Id.*, p. 73).

With respect to his mental status examination, Dr. Hart found that Ms. Belton had an appropriate affect and that her thoughts were goal directed. (Doc. 6-9, p. 73). Ms. Belton had trouble subtracting serial sevens from one hundred and making other simple math calculations. (*Id.*, pp. 73-74). In addition, Ms. Belton could remember only one of three words Dr. Hart asked her to recall after a three-minute interval. (*Id.*, p. 73).

Based on his observations and examination, Dr. Hart concluded that Ms. Belton is "of probable low average intelligence" and that "[a]ny issue of employability would seem to be from [Ms. Belton's] physical issues." (*Id.*, p. 74). Dr. Hart believed that Ms. Belton could handle her own financial affairs and live independently. (*Id.*). Dr. Hart diagnosed Ms. Belton with "adjustment disorder with mixed anxiety and depressed mood." (*Id.*).

The ALJ gave significant weight to Dr. Hart's opinion. (Doc. 6-3, p. 38). Consistent with Dr. Hart's opinion, the ALJ found that Ms. Belton had the severe impairment of adjustment disorder with mixed anxiety and depressed mood. (*Id.*. p. 29).

## 2. *Dr. Goff's opinion*

At the request of Ms. Belton's attorney, Dr. Goff, a clinical neuropsychologist, examined Ms. Belton on May 10, 2016. (Doc. 6-10, p. 71). Dr. Goff reviewed Ms. Belton's medical records, including Dr. Hart's report, and Ms. Belton's school records. (*Id.*, pp. 71-72). In addition, Dr. Goff made behavioral observations, conducted a mental status exam, and administered several psychometric tests. (*Id.*, pp. 73-75).

Dr. Goff described Ms. Belton's speech as "generally logical and coherent." (Doc. 6-10, p. 73). Ms. Belton reported to Dr. Goff that she attended special education classes, which is confirmed by Ms. Belton's school records. (*Id.*, pp. 71, 73; *see also* Doc. 6-7, p. 92). Dr. Goff noted that Ms. Belton received a certificate of attendance for high school, rather than a diploma, and that she did not pass the high school graduation examination. (Doc. 6-10, pp. 72-73).

As part of his evaluation, Dr. Goff administered a series of psychometric assessments. Dr. Goff administered a test for dissimulation of cognitive deficits to detect malingering, and Ms. Belton's score for that test "suggest a straightforward performance." (Doc. 6-10, p. 73). On the Wechsler Adult Intelligence Scale, Ms. Belton achieved a full scale IQ score of 67, a verbal comprehension score of 66, a perceptual reasoning score of 73, a working memory score of 77, and a processing score of 74. (*Id.*, p. 74). Ms. Belton's full scale IQ score falls in the intellectually

disabled range, and Dr. Goff noted that the score was compatible with the intellectual assessment estimates from her school records. (*Id.*). The Reitan-Indiana Aphasia Screening test revealed that Ms. Belton "was able to read a sentence at the first grade level," but "had difficulty at the fourth grade level." (*Id.*). Ms. Belton scored a word reading score at the 3.8 grade level on the Wide Range Achievement Test. (*Id.*, p. 75).

Dr. Goff also conducted personality testing. Based on the personality tests, Dr. Goff found that Ms. Belton shows marked distress about her physical condition and "sees life as severely disrupted by a variety of physical problems," and Dr. Goff found that Ms. Belton shows "an unusual degree of concern about physical functioning and health matters and impairment arising from somatic symptoms." (Doc. 6-10, p. 75). Dr. Goff noted that Ms. Belton "indicates that she is experiencing a discomforting level of anxiety and tension" and found that "[s]he is likely to be plagued by worry to a degree that her ability to concentrate and attend are significantly compromised." (*Id.*).

Dr. Goff concluded that Ms. Belton is intellectually disabled and functionally illiterate. (Doc. 6-10, p. 75). Dr. Goff also found that Ms. Belton exhibited "indications for adaptive skills deficits." (*Id.*, p. 76). Dr. Goff diagnosed Ms. Belton with:

> Adjustment Disorder with Depressed Mood[,]
> Intellectual Disability[, and]

10

Rule out Pain Disorder with Psychological Features and Associated with a General Medical Condition.

(*Id.*, p. 76).  Dr. Goff also concluded that Ms. Belton's "cognitive deficits represent severe impairment" and that "[h]er physical problems quite likely represent an additional impediment to vocational activity."  (*Id.*).

Along with his evaluation of Ms. Belton, Dr. Goff completed a medical source statement.  (Doc. 6-10, pp. 67-69).  In his statement, Dr. Goff opined that Ms. Belton had mild limitations in her ability to understand, remember, and carry out simple instructions; mild to moderate limitations in her ability to make simple work-related decisions; moderate limitations in her ability to understand and remember complex instructions; and marked limitations in her ability to carry out complex instructions and to make judgments on complex work-related decisions. (*Id.*, p. 67).  Dr. Goff opined that Ms. Belton had moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers, and marked limitation in her ability to respond appropriately to usual work situations and to changes in routine work settings.  (*Id.*, p. 68).  According to Dr. Goff, Ms. Belton has these limitations due to her low IQ score.  (*Id.*).

Consistent with Dr. Goff's opinion, the ALJ found that Ms. Belton has an IQ score in the intellectually disabled range, which he recognized as a severe impairment.  (Doc. 6-3, pp. 29, 35).  Additionally, the ALJ found that Dr. Goff's opinions that Ms. Belton had mild limitations in her ability to understand,

remember, and carry out simple instructions and mild to moderate limitations in her ability to make judgments on simple work-related decisions were consistent with the record as a whole, and those limitations are reflected in the ALJ's finding of Ms. Belton's RFC. (*Id.*, pp. 35, 38). Nevertheless, the ALJ gave very little weight to the opinion of Dr. Goff. (*Id.*, p. 35). The ALJ specifically rejected Dr. Goff's conclusion that Ms. Belton is intellectually disabled and functionally illiterate, that Ms. Belton always worked in "relatively menial tasks," and that Ms. Belton has marked limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*, pp. 33-35, 38).[2] Substantial evidence supports the ALJ's decision to give little weight to these opinions.

First, with respect to the issue of intellectual disability and functional illiteracy, Dr. Goff's opinion that Ms. Belton is intellectually disabled is not a medical opinion, "but [is] instead, [an] opinion[] reserved to the Commissioner." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (effective August 24, 2012 to March 26, 2017); *see also Hutchison v. Astrue*, 408 Fed. Appx. 324, 327 (11th Cir. 2011) (finding that an opinion regarding whether a claimant "could hold a job is a vocational opinion, not a medical one" and is a "question reserved to the ALJ"); 20

_____

[2] Ms. Belton asserts that the ALJ also rejected Dr. Goff's diagnosis of anxiety disorder. (Doc. 11, p. 13). However, Dr. Goff did not diagnose Ms. Belton with anxiety disorder. (*See* Doc. 6-10, p. 76). Rather, he diagnosed Ms. Belton with adjustment disorder with depressed mood. (*Id.*). The ALJ did not reject that diagnosis, but included adjustment disorder with mixed anxiety and depressed mood as one of Ms. Belton's severe impairments. (Doc. 6-3, p. 29).

C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.") (effective August 24, 2012 to March 26, 2017). Thus, the ALJ properly gave very little weight to Dr. Goff's opinion that Ms. Belton is intellectually disabled.[3]

Moreover, the ALJ found that Dr. Goff's opinion that Ms. Belton is functionally illiterate is inconsistent with other evidence in the record. (Doc. 6-3, p. 33). The record supports this finding. As described by the ALJ, Ms. Belton reported that she has no problems reading, understanding, or speaking English, and she reported that she can pay her bills, handle a savings account, and use a checkbook. (*Id.*, pp. 33-34 (citing Doc. 6-7, pp. 5, 24)). In addition, the ALJ noted that Ms. Belton completed her own disability report, provided specific details in response to the questions in her work history report, and completed a written questionnaire for her outpatient physical therapy. (Doc. 6-3, p. 34 (citing Doc. 6-7, pp. 13-31; Doc. 6-10, pp. 63-66)).[4]

Ms. Belton does not dispute the evidence cited by the ALJ, but argues that the ALJ's finding was based on a mistaken understanding of functional illiteracy and on an error in Dr. Goff's report. (Doc. 11, pp. 19-20). Dr. Goff reported that

---

[3] Ms. Belton also argues that Dr. Goff's diagnosis of intellectual disability shows that she meets the Listing for intellectual disability. (Doc. 11, pp. 6-7). The Court addresses that argument in section IV(B), below. *See* pp. 20-25, *infra*.

[4] The Court notes that Ms. Belton told Dr. Hart that some mornings, when she arises, she reads a book. (Doc. 6-9, p. 73).

Ms. Belton's word reading score is at the 3.8 grade level and that "[s]cores below the first grade level are thought to reflect functional illiteracy . . . ." (Doc. 6-10, p. 75). Dr. Goff's report contains an error; word reading scores below a fifth grade level, such as Ms. Belton's score, reflect functional illiteracy. (Doc. 6-11, p. 3). Dr. Goff clarified the difference between absolute illiteracy and functional illiteracy in a letter submitted to the Appeals Council, stating that functional illiteracy "relates to an inability to read and write at a level which would be necessary for vocational activity which mainly requires writing . . . ." (*Id.*, p. 4).

Even if the ALJ based his finding that Ms. Belton is not functionally illiterate on a mistaken understanding of the term or on an error in Dr. Goff's report, Ms. Belton has not shown how the ALJ's alleged error caused any harm. The Social Security regulations define illiteracy as "the inability to read or write" and state that the agency will "consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. § 404.1564(b)(1). Ms. Belton does not argue that she cannot read or write simple messages, (*see* Docs. 11 & 13), and the evidence cited by the ALJ demonstrates that Ms. Belton can read and write simple messages. Thus, Ms. Belton is not illiterate under the regulations. In addition, Ms. Belton did not cite authority to suggest that a finding of functional illiteracy would mandate a conclusion that Ms. Belton is intellectually disabled,

and the Court has found no such authority. As a result, even if the ALJ erred by finding that Ms. Belton is not functionally illiterate, the error is harmless and does not provide a basis for relief. *See Colon v. Colvin*, 660 Fed. Appx. 867, 869 (11th Cir. 2016) (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)) ("An error is harmless if it does not affect the ALJ's ultimate decision.").

With respect to the issue of work in relatively menial tasks, Ms. Belton contends that the ALJ made several factual errors regarding her work history and improperly relied on those errors to reject Dr. Goff's statement and his diagnosis of intellectual disability. (Doc. 11, p. 15). Ms. Belton first argues that the ALJ erred by finding that she worked as a CNA. (*Id.*). Though Ms. Belton attended classes in a CNA program, she did not receive her CNA certification, and she asserts that her only work in the healthcare field was as a "sitter" who helped bathe and feed patients at their homes and who transported patients to doctor's appointments. (Doc. 11, p. 15; Doc. 6-8, p. 6; *see also* Doc. 6-3, pp. 34, 70-71, 77-78).[5]

Based on Ms. Belton's testimony at the administrative hearing, the VE categorized her work in healthcare as work as a CNA, which is semi-skilled work. (Doc. 6-3, p. 86). According to the Dictionary of Occupational Titles ("DOT"),

---

[5] According to Ms. Belton, the ALJ stated that she had been certified as a CNA. (Doc. 11, p. 15). The ALJ did not find that Ms. Belton received her CNA certification. Rather, the ALJ stated that Ms. Belton "did not go in front of the board for certification because of lack of money and transportation." (Doc. 6-3, p. 34). The ALJ's statement is supported by Dr. Hart's report. (*See* Doc. 6-9, p. 73).

the duties of a CNA include bathing and dressing patients, feeding patients requiring help, transporting patients, and running errands. DOT 4th Ed., Revised 1991 at § 355.674-014 (available at https://www.oalj.dol.gov/LIBDOT.HTM). In addition, a CNA "[m]ay assist in providing . . . personal care to patients in private home settings . . . ." *Id.* Relying on the VE's testimony, the ALJ referred to Ms. Belton's work in healthcare as employment as a CNA, but he recognized that Ms. Belton did not receive her CNA certification. (Doc. 6-3, p. 34). In describing Ms. Belton's work as a CNA, the ALJ noted that she "performed such duties as bathing the clients, assisting them with their meals, using her car to run errands for them and transport them to grocery shopping and to doctor's appointments." (*Id.*). Thus, even if the ALJ erred by stating that Ms. Belton worked as a CNA, the error is harmless because the ALJ accurately described Ms. Belton's work in the health care field.

Ms. Belton also contends that the ALJ erred by relying in part on her history of work in the fast food industry to reject Dr. Goff's diagnosis of intellectual disability. (Doc. 11, p. 16). Ms. Belton testified that she worked as an opening person at a Wendy's fast food restaurant, and in that position, she chopped vegetables for the salad bar and mixed the "hot bar meals" together to get everything ready to open the hot bar and salad bar at the restaurant. (Doc. 6-3, pp. 72-73). Based on Ms. Belton's testimony, the VE categorized Ms. Belton's job at

Wendy's as a composite job as a salad maker and steam table attendant, and the VE testified that the work was semi-skilled. (*Id.*, p. 86).

Relying on the VE's testimony, the ALJ described Ms. Belton's work at Wendy's as semi-skilled, and the ALJ stated in his decision that "maintaining the temperatures consistent with public health regulations is certainly a task that cannot be classified as 'menial.'" (Doc. 6-3, p. 34). There is nothing in the record to support the ALJ's assumption that Ms. Belton maintained the temperatures for the hot bar and salad bar at Wendy's. Therefore, the ALJ erred by stating that Ms. Belton maintained food temperatures as part of her job at Wendy's. The error is harmless, however, because the VE classified Ms. Belton's work at Wendy's as semi-skilled (without referring to maintaining food temperatures), and the ALJ properly relied on the VE's classification of Ms. Belton's work. As a result, the ALJ's inaccurate description of Ms. Belton's job duties as an opener at Wendy's did not affect the ALJ's ultimate decision, and the inaccurate description constitutes harmless error. *See Colon*, 660 Fed. Appx. at 869.[6]

--------------------------------

[6] Ms. Belton also asserts that the ALJ erred by relying on a statement that she made in her work history report to reject Dr. Goff's assessment that her work involved menial tasks. (Doc. 11, p. 17). The ALJ pointed to Ms. Belton's statement that she provided counseling to patients as evidence that Ms. Belton had performed work that required more than menial tasks. (Doc. 6-3, p. 34 (citing Doc. 6-7, p. 16)). Even if it was error for the ALJ to rely on Ms. Belton's statement, the error was harmless because, as discussed above, other evidence supports the ALJ's assessment that Ms. Belton's work history includes work beyond menial tasks.

Finally, with respect to the issue of her ability to respond appropriately at work, Ms. Belton argues that the ALJ erred by finding that she "never left a job because of difficulties doing the work." (Doc. 11, p. 16). Ms. Belton's argument misses the mark because the ALJ did not find that Ms. Belton never left a job because of difficulties doing the work.[7] Rather, the ALJ found that Ms. Belton had not been terminated or quit a job because of difficulties responding to changes. (Doc. 6-3, p. 38). Indeed, although Ms. Belton was fired from two jobs, there is no evidence that she ever left a job because of difficulty responding to changes in her work setting. In addition, the ALJ accounted for Dr. Goff's finding that Ms. Belton has restrictions in her ability to respond appropriately to usual work situations and to changes in a work setting when, in his RFC assessment, the ALJ limited Ms. Belton to simple and routine work without a production quota and with only occasional changes in the work setting that are introduced gradually and well explained. (Doc. 6-3, p. 35).

In her reply brief, Ms. Belton asserts that the ALJ applied only one of the factors that an ALJ must consider when evaluating medical opinions, and she argues that the ALJ erred by addressing only consistency with the record when

---

[7] Ms. Belton worked as a custodian for several years in different jobs, and she was fired from one of her jobs as a custodian after five months because she had trouble mixing solutions and using a machine that cleans floors. (Doc. 6-3, pp. 66-67). Ms. Belton also reported being fired from a job at Indian Rivers Mental Health Center for not following instructions. (Doc. 6-7, p. 27).

evaluating Dr. Goff's opinion. (Doc. 13, pp. 5-6). Ms. Belton's argument is not persuasive. Under the regulations in place when the ALJ rendered his decision, an ALJ considers the following factors when evaluating a medical opinion: (1) the examining relationship between the claimant and medical source; (2) the treating relationship; (3) the supportability of the opinion with, among other things, medical signs and tests; (4) the consistency of the opinion with the record as a whole; (5) the medical source's specialty; and (6) other factors, such as the source's familiarity with disability programs and the claimant's record. 20 C.F.R. § 404.1527(c) (effective August 24, 2012 to March 26, 2017).

In his decision in this case, the ALJ discussed more than the consistency of Dr. Goff's opinion with the rest of the record. The ALJ considered the examining relationship between Dr. Goff and Ms. Belton because he noted that Dr. Goff evaluated Ms. Belton in May 2016, and the ALJ summarized Dr. Goff's findings. (Doc. 6-3, pp. 30-31). The ALJ also considered the testing conducted by Dr. Goff and Dr. Goff's observations of Ms. Belton, and the ALJ noted Dr. Goff's familiarity with Ms. Belton's educational record. (*Id.*, pp. 30-31, 33, 37-38). The ALJ did not expressly consider Dr. Goff's specialty or state that Dr. Goff was not one of Ms. Belton's treating physicians, but the Court finds no error in that aspect of the ALJ's decision.

The ALJ did not disregard Dr. Goff's opinions; the ALJ reviewed Dr. Goff's opinions and report in his administrative decision. (*See* Doc. 6-3, pp. 30-31, 33-35, 37-38). Moreover, as discussed above, any errors the ALJ made in his consideration of Dr. Goff's opinions were harmless, and the ALJ provided sufficient reasoning for assigning Dr. Goff's opinion little weight. The Court may not reweigh the evidence, and the Court finds that substantial evidence supports the ALJ's decision to assign Dr. Goff's opinion little weight.

**B.** **Substantial evidence supports the ALJ's decision that Ms. Belton's impairments do not meet or medically equal Listing 12.05(C).**

Ms. Belton argues that the ALJ erred by finding that she did not meet Listing 12.05(C) for intellectual disability. (Doc. 11, pp. 6-7, 14-15). The Court is not persuaded.

As an initial matter, the diagnosis of intellectual disability is insufficient to establish that Ms. Belton meets the requirements of Listing 12.05(C). *See* 20 C.F.R. § 416.925(d) ("[A claimant's] impairment(s) cannot meet the criteria of a listing based only on a diagnosis."). Instead, to meet Listing 12.05(C), Ms. Belton must meet all of the criteria set forth in the Listing. *See Gibbs v. Comm'r, Soc. Sec. Admin.*, 586 Fed. Appx. 799, 802 (11th Cir. 2017) ("[I]t is not enough for [a claimant] to show that she meets the criteria for a diagnosis of intellectual

disability under the DSM-V . . . ; rather, for her impairment to satisfy a listing, she must meet the Listing's criteria.") (citation and emphasis omitted).

"To meet Listing 12.05 for [intellectual disability], 'a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22.'" *Perkins v. Comm'r, Soc. Sec. Admin*, 553 Fed. Appx. 870, 872 (11th Cir. 2014) (quoting *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)). "A [c]laimant must meet these diagnostic criteria in addition to one of the four sets of criteria found in 12.05(A), (B), (C), or (D) in order to show that [her] impairments are severe enough to meet or equal Listing 12.05." *Perkins*, 553 Fed. Appx. at 872 (citing 20 C.F.R. § 404, Subpart P, Appx. 1, § 12.00(A)). Relevant to this case, and under the Social Security regulations in effect at the time of the ALJ's decision, Listing 12.05(C) required "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.05(C) (effective May 26, 2016 – September 28, 2016).

Ms. Belton has a valid, qualifying full scale IQ score of 67, (Doc. 6-10, p. 74), and consistent with Dr. Goff's opinion, the ALJ found that Ms. Belton has the severe impairment of "IQ scores in the intellectually disabled range." (Doc. 6-3, p. 29, *compare* Doc. 6-10, p. 74). In addition, Ms. Belton has the additional severe

impairments of hypertension, hypothyroidism, obesity, degenerative disc disease, and adjustment disorder. (Doc. 6-3, p. 29). Those impairments impose an additional and significant work-related limitation of function. *Rodriguez v. Comm'r of Soc. Sec.*, 633 Fed. Appx. 770, 773 (11th Cir. 2015) ("Under [11th Circuit] precedent, a 'severe' impairment, for purposes of step two, has a 'significant work-related limitation of function' under 12.05(C)."). Ms. Belton's "qualifying IQ score creates a rebuttable presumption that [she] manifested deficits in adaptive functioning before age 22." *Hubbard*, 643 Fed. Appx. at 871 (citing *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001)).[8]

Even so, under Eleventh Circuit precedent, an ALJ may rely on "other evidence in the record on the claimant's daily activities and behavior" to find that a claimant does not meet Listing 12.05(C). *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *see also Jones v. Comm'r of Soc. Sec.*, 695 Fed. Appx. 507, 509 (11th Cir. 2017) (citing *Hodges*, 276 F.3d at 1269). In other words, Ms. Belton's activities of daily living may rebut the presumption that she has the deficits in adaptive functioning required to meet Listing 12.05(C). The ALJ recognized that

---

[8] Regarding deficits in adaptive functioning, the Eleventh Circuit has explained: "The Administration has not specifically defined 'deficits in adaptive functioning.' [] However, according to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), adaptive functioning refers 'to how well a person meets standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical.'" *Gibbs v. Comm'r, Soc. Sec. Admin.*, 686 Fed. Appx. 799, 801 (11th Cir. 2017) (citing 20 C.F.R. Pt. 404 subpt. P, app. 1, 12.00, 12.05 (2015) and DSM-V at 37).

Ms. Belton's IQ score creates a presumption of deficits in adaptive functioning, but found that Ms. Belton's activities of daily living as an adult and her employment history rebut that presumption. (Doc. 6-3, p. 35).

Ms. Belton argues that the ALJ erred by finding that her activities of daily living rebut the presumption of deficits in adaptive functioning. In particular, Ms. Belton points to the criteria for a diagnosis of intellectual disability set out in the DSM-V to show that Dr. Goff necessarily found that she exhibits sufficient deficits in adaptive functioning in at least one activity of daily living to be intellectually disabled and meet the criteria of Listing 12.05(C). (Doc. 11, pp. 18-19) (citing DSM-V at 33). Ms. Belton argues that the activities of daily living cited by the ALJ do not refute Dr. Goff's finding that she has deficits in at least one activity of daily living. (Doc. 11, p. 19). Ms. Belton's argument falls short because the issue before the Court is whether there is substantial evidence to support the ALJ's decision and not whether there is evidence in the record that could support a finding that she is intellectually disabled. *See Crawford*, 363 F.3d at 1158-59 ("Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence.") (quotation omitted). The Court finds that substantial evidence supports the ALJ's conclusion that Ms. Belton does not have sufficient deficits in adaptive functioning to meet Listing 12.05(C).

Ms. Belton lives on her own in a home, and she reports that she is able to prepare simple meals for herself, drive a car, pay bills, count change, handle a savings account, and use a checkbook. (Doc. 6-7, pp. 21-24). Ms. Belton told Dr. Hart that she raised two daughters by herself, knows how to do her housework, goes to church "every so often," and does some shopping. (Doc. 6-9, p. 73).[9] In addition, Ms. Belton engaged in substantial gainful activity until February 2015 and held a variety of jobs, including, as described above, semi-skilled work as a fast food opening person. (Doc. 6-3, pp. 29, 34-36). Ms. Belton also has worked as a custodian, a production worker, and a "sitter" who bathed clients, helped clients with meals, ran errands for clients, and drove them to appointments with doctors. (Doc. 6-3, pp. 69-70, 77-78; Doc. 6-7, p. 13; Doc. 6-8, pp. 6-7).

Ms. Belton's daily activities and employment history support the ALJ's finding that she lacked sufficient deficits in adaptive functioning to meet Listing 12.05(C). *See Gibbs v. Comm'r, Soc. Sec. Admin.*, 586 Fed. Appx. 799, 802 (11th Cir. 2017) (finding that substantial evidence supported an ALJ's decision that a claimant with a qualifying IQ score did not meet Listing 12.05(C) based on evidence that the claimant lived alone at times, cared for her daughter, did her own

---

[9] According to Dr. Goff, individuals with intellectual disabilities "almost invariably overstate their skills and ability." (Doc. 6-11, p. 5). However, Ms. Belton did not cite any authority suggesting that an ALJ cannot rely on the testimony and reports of a claimant who has an IQ score in the intellectually disabled range, and the Court has found no such authority. Moreover, even if Ms. Belton overstated her abilities, her employment history supports the ALJ's conclusion that she does not have sufficient deficits in adaptive function to meet Listing 12.05(C).

laundry, slowly cleaned her home, cooked simple meals, drove, handled her own money, payed bills, and shopped slowly); *Prunty v. Acting Comm'r of Soc. Sec. Admin.*, 635 Fed. Appx. 757, 759 (11th Cir. 2015) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)) (finding that substantial evidence supported an ALJ's conclusion that a claimant lacked sufficient deficits in adaptive functioning to meet the requirement of Listing 12.05(C) when the claimant could "cook simple meals, do household chores, drive a car by herself, take care of a dog, babysit children, and work part-time at McDonald's"); *Garrett v. Astrue*, 244 Fed. Appx. 937, 939 (11th Cir. 2007) (finding that substantial evidence supported the ALJ's finding that a claimant with a qualifying IQ score did not have the required limitations to adaptive functioning based on evidence that the claimant could cook simple meals, perform household chores and yard work, and build model cars and on evidence that the claimant's "daily activities include church attendance, television viewing, card playing, and walking in the mall").

Based on the foregoing and given the deferential standards of review that the Court must apply, the Court concludes that substantial evidence supports the ALJ's decision that Ms. Belton does not meet Listing 12.05(C).

## C. Substantial evidence supports the ALJ's finding that Ms. Belton's combination of impairments is not disabling.

Ms. Belton contends that the ALJ erred by finding that her combination of impairments is not disabling. (Doc. 11, p. 21). The Court does not agree.

When an ALJ finds that a claimant has several impairments, the ALJ must consider the impairments in combination. The Eleventh Circuit has held that an ALJ satisfies this duty by stating that he considered whether the claimant suffered from any impairment or combination of impairments. *See Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002) (reversing a district court's determination that an ALJ did not consider or discuss the cumulative effects of a claimant's impairments where the ALJ explicitly stated that the claimant "'did not have an impairment or combination of impairments listed in, or medically equal to one listed'" in the regulations) (emphasis in original omitted); *Hutchinson v. Astrue*, 408 Fed. Appx. 324, 327 (11th Cir. 2011) (finding that the ALJ's statement that [claimant] "did not have an 'impairment, individually or in combination' that met one of the listed impairments . . . shows that the ALJ considered the combined effects of [claimant's] impairments during her evaluation"). In this case, the ALJ explicitly stated that Ms. Belton does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (Doc. 6-3, p. 31). This statement demonstrates that the ALJ considered the combined effects of Ms. Belton's impairments. In addition, the ALJ included all of Ms. Belton's impairments in the hypothetical he posed to the VE at the administrative hearing, and the ALJ accounted for all of Ms. Belton's impairments in his determination of her RFC. (Doc. 6-3, pp. 35, 86-87).

Substantial evidence supports the ALJ's conclusion that Ms. Belton's combination of impairments is not disabling. First, with respect to Ms. Belton's degenerative disc disease, Ms. Belton testified that medication helps her pain, and at a doctor's appointment in February 2016, she reported that she had no back pain. (Doc. 6-3, p. 75, Doc. 6-10, pp. 13, 30); *see also King v. Comm'r, Soc. Sec. Admin*, 550 Fed. Appx. 781, 783 (11th Cir. 2013) (citing *McSwain v. Bowen*, 814 F.2d 617, 620 n.1 (11th Cir. 1987)) ("A condition that is controlled by medication may not be a substantial limitation for purposes of a claimant's RFC."). Ms. Belton's hypertension and hypothyroidism also are controlled by medicine. (Doc. 6-10, pp. 18, 22).

Moreover, Ms. Belton's medical records reveal that no physician has placed restrictions on her due to her hypertension, hypothyroidism, or palpitations. (*See* Docs. 6-9 & 6-10). In addition, although Ms. Belton's BMI is within the obese range, she has not alleged any limitations due to her obesity, and her medical records do not show that a physician has placed restrictions on her due to her obesity. (*See* Doc. 6-3, p. 36, Doc. 6-9, p. 24; *see also* Docs. 6-9 & 6-10). Finally, Ms. Belton has not sought treatment for her adjustment disorder, and no physician has placed restrictions on her due to her adjustment disorder. (*See* Docs. 6-9 & 6-10).

Therefore, substantial evidence supports the ALJ's conclusion that the combination of Ms. Belton's impairments is not disabling.

### D. The Appeals Council properly denied Ms. Belton's request for review.

Finally, Ms. Belton contends that the Appeals Council erred by denying review of the ALJ's decision because the evidence she submitted to the Council supports a finding of disability and shows that the ALJ's decision is not supported by substantial evidence. (Doc. 11, pp. 21-22). The Court does not agree.

After the ALJ's unfavorable ruling, Ms. Belton submitted her affidavit and a letter signed by Dr. Goff to the Appeals Council to support her claims. (Doc. 6-8, pp. 6-8, Doc. 6-11, pp. 2-6). Under Eleventh Circuit precedent, the Court must consider this evidence when reviewing the Commissioner's decision denying Ms. Belton's claims. *See Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1258 (11th Cir. 2007) ("[A] federal district court must consider evidence not submitted to the administrative law judge but considered by the Appeals Council when that court reviews the Commissioner's final decision denying Social Security benefits."). The Court finds that none of the additional evidence Ms. Belton submitted to the Appeals Council would have changed the ALJ's decision.

First, in her affidavit, Ms. Belton attests that she did not receive her CNA certification; the ALJ found as much. (Doc. 6-8, p. 6; *compare* Doc. 6-3, p. 34). Ms. Belton also states that she worked only as a "sitter" and not as a CNA, but Ms.

Belton's description of her work as a sitter is consistent with the ALJ's description of her work as a CNA. (Doc. 6-8, pp. 6-7; *compare* Doc. 6-3, p. 34; *see* pp. 15-16 above). Ms. Belton also provides details about her work at a Wendy's restaurant, which are consistent with her hearing testimony, and she attests that she never provided counseling to mental health patients. (Doc. 6-8, p. 7). As discussed above, the ALJ's error in describing Ms. Belton's work at Wendy's and any errors he made by relying on Ms. Belton's statement regarding her work counseling patients were harmless. (*See* pp. 16-17, *supra*).

Ms. Belton also submitted a letter from Dr. Goff to the Appeals Council. (Doc. 6-11, pp. 2-6). In the letter, Dr. Goff states that Ms. Belton attended special education classes, received a certificate from high school, and does not have a certification as a CNA. (*Id.*, pp. 2-3). Those statements are consistent with the ALJ's findings. (Doc. 6-3, pp. 33-35). Dr. Goff also states that mental status examination is not appropriate for individuals with intellectual disabilities, and he challenges some of Dr. Hart's findings. (Doc. 6-11, p. 3). Even if Dr. Goff is correct, the ALJ, and not an examining source, must weigh the evidence. *See, e.g., Winschel*, 631 F.3d at 1178; *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). Dr. Goff also explains the differences between functional and absolute illiteracy, but as explained above, any error the ALJ made by rejecting Dr. Goff's opinion that Ms. Belton is functionally illiterate was harmless. (Doc. 6-11, pp. 2-

4); *see also* pp. 13-15, *supra*. Finally, Dr. Goff opines that individuals with intellectual disabilities often overstate their abilities, (Doc. 6-11, pp. 4-5), but Ms. Belton did not cite authority to suggest that an ALJ cannot rely on the statements and testimony from a claimant with alleged intellectual disabilities. (*See* Docs. 11 & 13; *see also* note 8 above).

Based on the foregoing, the Court finds that the additional evidence Ms. Belton submitted to the Appeals Council does not show that the ALJ erred by denying benefits to her or that the ALJ's decision is not supported by substantial evidence. Likewise, the evidence does not show that the ALJ's decision was contrary to the weight of the evidence before the Appeals Council. Thus, the Appeals Council did not err by denying review of the ALJ's decision. *See* 20 C.F.R. § 404.970 (effective February 9, 1987 to January 16, 2017).

## V.    CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards.  The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  Accordingly, the Court affirms the Commissioner.  The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 9, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE